Charles McCLELLAND  *v.*  Joel M. MURRAY

CA 05-124                                              213 S.W.3d 33

Court of Appeals of Arkansas
Opinion delivered September 14, 2005

*Compton, Prewett, Thomas & Hickey, L.L.P.*, by: *Matthew J. Shepherd*, for appellant.

*Shackleford, Phillips, Wineland & Ratcliff, P.A.*, by: *Casey Castleberry*, for appellee.

KAREN R. BAKER, Judge. Charles McClelland appeals from an order of the Union County Circuit Court denying his petition to adopt his minor step-children, A.M. and S.M. McClelland argues that the circuit court erred in finding that the best interest of the minor children was served by denying his adoption petition and by finding that appellee Joel M. Murray had justifiable cause for his failure to communicate with his daughters. We reverse.

The facts in this case are largely not in dispute. At the time the adoption petition was heard, Charles McClelland had been married to Alicia McClelland for more than nine years. A.M. and S.M. are twin girls born of Alicia's previous marriage to Joel M. Murray. That marriage ended when the twins were eighteen months old. In the ensuing fourteen years, Murray had no contact with his children. He did, however, faithfully pay child support, and his obligation was current as of the date of the hearing. McClelland stipulated that regardless of whether the adoption was granted, A.M. and S.M. would continue to live with him.

At the hearing, McClelland testified that he had acted as a father to the twins since he married their mother and that he loved them with all of his heart. He stated that he was a Deacon at the First Baptist Church and that the girls have a "good Christian foundation and background." According to McClelland, A.M. and S.M. were excelling as students with 3.9 grade-point averages at Westside Christian School. McClelland asserted that he was proud of the girls, and regardless of the adoption, he considered them to be his daughters. He also claimed that he would not stand in the way of Murray contacting the girls if he adopted them.

Alicia McClelland testified that she consented to the adoption and wished that McClelland would become the twins' adoptive father. She confirmed that the girls last had face-to-face contact with Murray on Mother's Day of 1989, and he had not attempted to visit with them since that time. She asserted that Murray knew where her parents lived and could have ascertained her whereabouts if he had desired contact with the children. She claimed that if he had called, she would not have discouraged contact. Alicia opined that it would be in the girls' best interest to be adopted because McClelland "has been in their life for nine or ten years," taught them to drive, had been to every school activity, and had helped them to be active in the church. She stated that when McClelland married her, "he also married them." According to Alicia, the girls considered McClelland to be their father and even called him "Daddy." She also stated that if the adoption were granted, she would not prevent Murray from contacting the girls.

On cross examination, Alicia admitted that she sought restricted visitation in her divorce action and opposed allowing visitation at Murray's home out-of-state. She also admitted that she had made accusations of inappropriate sexual comments by Murray concerning her then-infant daughters.

Both S.M. and A.M. testified that they desired to be adopted by McClelland, that they considered him their father, and that they called him "Daddy." The girls confirmed that McClelland had been an active participant in their lives and that they had no contact with Murray.

Murray testified that he currently lived in New Jersey and was working for the government in a position that required him to have a top secret security clearance. He stated that at the time of his divorce from Alicia, he was living in Missouri and subsequently moved to Nevada. Although he and Alicia filed for divorce almost simultaneously, and although he never lived in Arkansas, he was advised that Arkansas was the proper forum for matters relating to the custody of the children. Ultimately, Murray came to Arkansas to establish child support and secure visitation. However, during the pendency of that action, he testified that Alicia levied allegations against him that he might "possibly cause bodily harm to my daughters in a sexual nature." Fearing that this type of allegation would jeopardize his top secret security clearance and deciding it was in his daughters' best interest not to put them through the kind of ordeal associated with fighting the allegations, he chose simply not to have contact with his daughters. He felt that in order to

exercise visitation, he would have to fly to Arkansas and stay in a hotel, and to completely protect himself from spurious allegations, he would have to take the girls to a doctor to be examined before and after the visit. Further, Murray stated that he contacted Alicia approximately a year after the divorce and found her to be uncooperative and threatening. He also stated that he tried contacting Alicia's parents, but Alicia's mother told him that she had been instructed not to tell him where the girls were. He asserted that his relationship with his daughters early in their lives was "taken away" from him, and he intended to reestablish a relationship with the girls when they were in college so they could at least know who their father was. Murray characterized his decision to relinquish his right to visit the girls as putting them first, his job second, and himself third. Regarding telephonic communication, he admitted that he last attempted it when the girls were twenty-two months old and at that time, "they had no clue of how to communicate with [him]." He also admitted that he did not attempt to write to his daughters and that he last sent them Christmas presents in 1990.

After taking the matter under advisement, the trial judge denied the adoption petition. He found "reasonable" Murray's belief that sexual misconduct allegations would require that he have the children medically examined before and after his visitation made such visitation "not feasible" and that such allegations would also jeopardize his security clearance and thus his employment. Accordingly, the trial court ruled that Murray's lack of contact with his children was justified. The trial court noted, however, that "such a complete forbearance is excessive and has its risks" in that when the children turned eighteen, Murray's consent to the adoption would not be required. The trial judge also found that the children were "well adjusted in their academic, religious, and social lives, excelling and performing responsibly." However, he reasoned that the children's "accomplishments" were gained without the benefit of adoption and that therefore "their performance will continue at the same level with or without adoption." On this basis, the trial judge concluded that there was no evidence presented that the adoption would be in the best interest of the children.

On appeal, McClelland argues that the trial court erred in finding that the best interests of the children was served by denying the adoptions, contending that despite the fact that the twins will "no doubt continue to be outstanding young ladies," the trial

court "overlooks" that there is "something to be said" for having a "legally recognized father-daughter relationship with the man who raised you." He contends that it is in the girls' best interest to have a parent-child relationship because he has "been there for them" and they consider him their father, rather than to preserve a relationship with a man to whom they have not talked and whom they had not seen in over fourteen years. McClelland also argues that the circuit court erred in finding that Murray had "justifiable cause" for his failure to communicate with the twins. He cites *Ray v. Sellers*, 82 Ark. App. 530, 120 S.W.3d 134 (2003), for the proposition that failure to communicate without justifiable cause is "one that is voluntary, willful, arbitrary, and without adequate excuse," and that not even a total failure to communicate with a child is required under Ark. Code Ann. § 9-9-207(a)(2) (Supp. 2003). Regarding the latter point, he characterizes Murray's failure to communicate with his children as not merely significant, but "total." Regarding the former standard, he argues that Murray's failure to communicate was voluntary and willful because it was his own decision and although he was granted visitation rights he chose not to exercise them. McClelland characterized the lack of communication as "arbitrary and without adequate excuse" because Murray claimed to be concerned over the possibility of allegations of sexual misconduct, which had not previously been made. We agree.

Arkansas Code Annotated section 9-9-207(a) provides in pertinent part that consent to adoption is not required of:

> (2) [a] parent of a child in the custody of another, if the parent for a period of at least one (1) year has failed significantly without justifiable cause (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree[.]

It is settled law that adoption statutes are strictly construed, and a person who wishes to adopt a child without the consent of the parent must prove that consent is unnecessary by clear and convincing evidence. *In re Adoption of Lybrand*, 329 Ark. 163, 946 S.W.2d 946 (1997). A finding concerning the necessity of a parent's consent in an adoption proceeding will not be reversed unless clearly erroneous. *In re Adoption of K.F.H. and K.F.H.*, 311 Ark. 416, 844 S.W.2d 343 (1993). We view the issue of justifiable cause as factual but one that largely is determined on the basis of the credibility of the witnesses.

This court gives great weight to a trial judge's personal observations when the welfare of young children is involved. *Id.* at 423, 844 S.W.2d at 347.

We are mindful that Murray testified, and the trial judge found it credible, that even an allegation of sexual misconduct involving his minor children would jeopardize his security clearance and, consequently, his employment. The trial court noted that this total lack of contact was "excessive," and we agree. Further, although Murray had the means to establish supervised visitation and enforce his visitation rights through the court, he instead abandoned all contact with the girls. However, no sexual abuse allegation could arise from a letter, a phone call, or a birthday present. We hold that this failure to communicate was not justifiable. Because Murray failed to significantly communicate with his children for more than one year, without justifiable cause, his consent to the adoption was not required under Ark. Code Ann. § 9-9-207.

We also reverse the trial court's finding that the best interests of the children were served by denying the adoptions. We simply do not subscribe to the trial judge's logic that because the children have thrived without being adopted by McClelland, there was no advantage in formalizing his status as their father. We hold that under these circumstances, the best way to guarantee that the children continue in the current successful nurturing environment was to grant McClelland's adoption petition. We therefore reverse and remand this case to the trial court for further proceedings consistent with this opinion.

Reversed and remanded.

ROAF and BIRD, JJ., agree.